DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**MICHAEL GRIECO,**
Appellant,

v.

**DAIHO SANGYO, INC., AW DISTRIBUTING, INC.,** and
**WAL-MART STORES EAST, LP,**
Appellees.

Nos. 4D20-2294 and 4D20-2557

[June 15, 2022]

Consolidated appeals from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; James Nutt, Judge; L.T. Case No. 502012CA021342XXXMB (AO).

Sean C. Domnick, Matthew T. Christ, and Lindsey E. Gale of Domnick, Cunningham & Whalen, Palm Beach Gardens, and Andrew A. Harris and Grace Mackey Streicher of Harris Appeals, P.A., Palm Beach Gardens, for appellant.

Agnieszka N. Chiapperini of Gaebe, Mullen, Antonelli & DiMatteo, West Palm Beach, for appellee Daiho Sangyo, Inc.

Lissette Gonzalez of Cole, Scott & Kissane, Miami, for appellee AW Distributing, Inc.

Sharon C. Degnan of Kubicki Draper, Orlando, for appellee Wal-Mart.

KLINGENSMITH, C.J.

Appellant Michael Grieco appeals the trial court's entry of final summary judgment in favor of appellees Daiho Sangyo, Inc. ("Daiho"), AW Distributing, Inc. ("AW"), and Wal-Mart Stores East, LP ("Wal-Mart"). Appellant alleges the trial court erred in granting summary judgment in favor of the appellees in his personal injury lawsuit for damages allegedly caused by a driver's ("Merrill") misuse of a product. For the reasons set forth below, we affirm.

**BACKGROUND AND PROCEDURAL HISTORY**

The product in question, known as Ultra Duster, is a compressed gas dusting spray that is not particularly distinct from other compressed gas dusters referred to as "keyboard cleaners," "compressed air," or "dust removers." Ultra Duster is manufactured by Daiho, distributed by AW, and retailed in several stores, including Wal-Mart. The product is designed to remove dust, dirt, and debris from computer keyboards and other electronic devices using pressurized air released from a hand-held canister. This product and other dust removers typically contain a pressurized volatile—fluorinated hydrocarbon gas called 1.1-difluoroethane ("DFE")—which is used in many aerosol propellant consumer products, including solvent-based products (e.g., alcohol, gasoline, paint thinners, hair spray, nail polish removers, and glue), and aerosol products that provide a propellant with or without a solvent (e.g., hair sprays, anti-perspirants, dust removers, spray paints, and spray varnishes).

DFE is a central nervous system depressant that can produce a short "high" akin to being impaired when inhaled. Inhaling DFE can also cause feelings of euphoria, dizziness, drowsiness, delusions, and hallucinations. DFE has long been associated with substance abuse in part because products containing DFE are inexpensive and widely available at retail locations. Getting high from inhaling DFE is informally referred to as "dusting" or "huffing." To discourage inhalant abuse, most manufacturers, including Daiho, use an additive called a "bitterant" designed to make the product unpleasant for human consumption. Ultra Duster's label specifically warns against misuse of the product by stating that "inhaling contents may be harmful or fatal" and notifying the consumer that the product "contains a bitterant to help discourage inhalant abuse."

To a large extent, such additives are successful. For a drug addict, the need to self-medicate and become both physically and emotionally numb is a relentless, persistent hunger that fuels each breath. For many of these addicts, relief is just a pill, a bottle, or a needle away. Others, however, get their "fixes" in more unconventional ways by employing commonly used and easily sourced household products like Ultra Duster. And, unfortunately, for some individuals, no warning and no chemical deterrent will dissuade them from a relentless quest to feed their addiction, no matter the risks. So it was with Amy Merrill.

According to the evidence presented to the trial court, Merrill was so addicted to getting high from DFE that the bitterant—which she called

"that nasty taste"—did not deter her from inhaling Ultra Duster and many other similar products. Merrill said that while the aerosols which she used all contained bitterants, she found that the "nasty taste" would get "milder and milder every time [she] did it. And eventually [she] wouldn't even taste it anymore." Once she became addicted to DFE, Merrill said she was "so far past the bitterant that [she] was used to [it] and [she] just didn't care." As a long-time daily aerosol user, Merrill was familiar with and had read Ultra Duster's warning label as well as labels on similar products, yet she nonetheless continued to misuse it. Though she understood from reading the warning label that inhaling the product was dangerous, Merrill said she felt she was "invincible" and that "nothing's going to happen to me, because I can do it."

Merrill often purchased Ultra Duster and similar products from various retailers, including Wal-Mart, intending to inhale the product to "get high." She had knowledge of both the immediacy and intensity of DFE's effects, knew those effects typically lasted between thirty and forty-five seconds, and knew that she was sometimes affected in different ways, later explaining that while she would usually just get a high from "dusting," it would sometimes cause her to pass out. Merrill also admitted that while she usually dusted at home and sometimes waited until the effects of DFE wore off before driving, she would also occasionally get or stay behind the wheel while under its influence.

The events leading to the accident in February 2012 are undisputed. Merrill drove to Wal-Mart and purchased one can of Ultra Duster along with a sports drink to divert any suspicion about her intended use of the canned aerosol. No Wal-Mart employee was aware that Merrill was addicted to huffing canned air. She never ingested aerosols on Wal-Mart property or in the presence of any employee, and no one at Wal-Mart was aware when she purchased the product that she planned to misuse it.

During her drive after leaving Wal-Mart, Merrill inhaled Ultra Duster while stopped at a red light. This time the inhalation caused her to lose consciousness. When the light turned green Merrill did not move her car, but she awakened when another driver honked his horn. Because of her altered mental state, she lost control of the car after hitting the gas, drove off the road, and smashed into two vehicles parked in appellant's driveway. Appellant, who was standing in the driveway at the time, was pinned under one of the vehicles and suffered severe injuries from the crash.[1]

---

[1] Merrill was subsequently convicted of driving under the influence causing or contributing to serious bodily injury, a third-degree felony under section 316.193(3)(a), (b) and (c)(2), Florida Statutes, and sentenced to six months in jail.

Soon after, appellant filed a civil suit against appellees as the companies involved in the manufacture, distribution, and retail sale of Ultra Duster for the following claims: Count I – Strict Liability for Defective Design; Count II – Strict Liability for Failure to Warn; and Count III – Negligence.[2] As the factual basis for his suit, appellant asserted appellees knew: (1) consumers used products like Ultra Duster to get high; (2) the added bitterant was not evenly distributed throughout the product to deter misuse; and (3) the canister's warning label was not adequate to prevent Merrill and others from misusing the product.

Appellees filed motions for summary judgment in 2015 and 2017, but the trial court denied both motions. In the first denial, the judge simply referred to the existence of unspecified material issues of fact. In response to the second motion, appellant presented information that the inhalation of compressed air products, like Ultra Duster, was "an emerging public health threat" and submitted multiple news articles to the court involving car accidents resulting from DFE inhalation. Appellant also submitted evidence that Wal-Mart—as well as AW and Daiho—had been notified that the bitterant added to Ultra Duster did not properly disperse throughout the can. The judge presiding over that hearing denied the second motion, stating it was "undeniable . . . that misuse of the instant product by some individuals for huffing or improper inhaling is foreseeable . . . . Whether it was foreseeable that Ms. Merrill would misuse the product she purchased and cause the damage she caused in this instance is a jury question."

After the First District Court of Appeal issued its opinion in *DZE Corp. v. Vickers*, 299 So. 3d 538 (Fla. 1st DCA 2020), *reh'g denied* (July 27, 2020), *rev. denied*, SC20-1280, 2021 WL 1426782 (Fla. Apr. 15, 2021), appellees moved a third time for summary judgment. Those motions were considered by a different judge. This court said it was not only persuaded by, but also bound by, *DZE*'s rationale, and therefore granted all appellees' motions for summary judgment, finding that Merrill's voluntary conduct of driving while impaired broke the causation chain so that appellees had no liability to appellant as a third party.

Appellant now appeals these final judgments, which have been consolidated before us.

---

[2] The complaint also included a negligence claim against Merrill and a loss of consortium claim by appellant's wife.

4

## STANDARD OF REVIEW

"The standard of review of the entry of summary judgment is *de novo*." *Craven v. TRG-Boynton Beach, Ltd.*, 925 So. 2d 476, 479 (Fla. 4th DCA 2006). "Summary judgment is proper if there are no genuine issues of material fact and if the moving party is entitled to a judgment as a matter of law." *Volusia County v. Aberdeen at Ormond Beach. L.P.*, 760 So. 2d 126, 130 (Fla. 2000). "[S]ummary judgment is appropriate where, as a matter of law, it is apparent from the pleadings, depositions, affidavits, or other evidence that there is no genuine issue of material fact . . . ." *The Fla. Bar v. Greene*, 926 So. 2d 1195, 1200 (Fla. 2006).

## STRICT LIABILITY GENERALLY

"Florida tort law provides that the manufacturer of a defective product may be subject to liability under two theories: negligence and strict liability. . . . In order to prevail under either theory, the plaintiff must establish that the product was defective or unreasonably dangerous." *Small v. Amgen, Inc.*, 134 F. Supp. 3d 1358, 1366 (M.D. Fla. 2015). "[P]roof of a defect determines a breach of duty under a negligence theory and the presence of an unreasonably dangerous condition under a strict liability theory." *O'Bryan v. Ford Motor Co.*, 18 F. Supp. 3d 1361, 1366 (S.D. Fla. 2014).

"[S]trict liability theories are generally distinct from negligence." *Ferayorni v. Hyundai Motor Co.*, 711 So. 2d 1167, 1170 (Fla. 4th DCA 1998). "Strict liability means negligence as a matter of law or negligence per se, the effect of which is to remove the burden from the user of proving specific acts of negligence." *West v. Caterpillar Tractor Co., Inc.*, 336 So. 2d 80, 90 (Fla. 1976). "Strict liability is not concerned with the reasonableness of a manufacturer's conduct . . . [instead] the focus is on the product itself and the reasonable expectations of the consumer." *Faddish v. Buffalo Pumps*, 881 F. Supp. 2d 1361, 1370 (S.D. Fla. 2012). In contrast, "under the negligence theory, the focus is on the whether a duty of care was owed to the injured parties, and whether the defendants breached that duty of care." *Wolicki-Gables v. Arrow Intern., Inc.*, 641 F. Supp. 2d 1270, 1287 (M.D. Fla. 2009), *aff'd*, 634 F.3d 1296 (11th Cir. 2011).

"[T]he term 'strict liability' is something of a misnomer. A manufacturer is not strictly liable for all injuries caused by its product, however it is used. On the contrary, a manufacturer is liable only when the product is used as intended." *Jennings v. BIC Corp.*, 181 F.3d 1250, 1256 (11th Cir. 1999) (citing *High v. Westinghouse Elec. Corp.*, 610 So. 2d 1259, 1262 (Fla.

1992)) (finding strict liability "applies to intended uses of products for which they were produced").[3] Therefore, "[i]n order for strict liability to apply to the manufacturer, the [product] . . . must have been used for the purpose intended" without regard for reasonable foreseeability of unintended use. *High*, 610 So. 2d at 1262. Applied to this case, strict liability attaches only when Ultra Duster is used as it was intended to be used, that is, for the purpose of cleaning dust and removing debris. *See Jennings*, 181 F.3d at 1256.

Because virtually any product can be misused, a manufacturer cannot be held responsible and liable for every possible, creative misuse that consumers can conceive. "Products liability does not make the manufacturer an insurer of all foreseeable accidents which involve its product. Virtually any product is capable of producing injury when put to certain uses or misuses. . . . An action is not maintainable in products liability merely because the design used was not the safest possible." *Hernandez v. Altec Env't. Prods., LLC*, 903 F. Supp. 2d 1350, 1360 (S.D. Fla. 2012) (quoting *Husky Indus., Inc. v. Black*, 434 So. 2d 988, 991 (Fla. 4th DCA 1983)).

## COUNT I – STRICT LIABILITY FOR DESIGN DEFECT

For his strict liability claim, appellant must show that the defective design—here, the assertion that the bitterant was not efficiently or uniformly dispersed in Ultra Duster's product—made the product unreasonably dangerous. "Strict liability turns on the question of a defective design which renders a product unreasonably dangerous." *Brown v. Glade & Grove Supply, Inc.*, 647 So. 2d 1033, 1035 (Fla. 4th DCA 1994). The alleged design defect must also cause unforeseeable dangers during normal—that is, intended—use of the product. *See Cook v. MillerCoors, LLC*, 829 F. Supp. 2d 1208, 1216 (M.D. Fla. 2011) ("A design defect is one that causes unforeseen hazards during normal use of the product.").

Appellant asserts the trial court made inappropriate factual determinations in its summary judgment ruling by drawing the conclusion that appellees did not need to make Ultra Duster a safer product. Appellant also argues Ultra Duster, with its combination of DFE and

---

[3] The Eleventh Circuit has followed the conclusions drawn by the Florida Supreme Court in *High v. Westinghouse Electric Corp.*, noting that the Court "did not adopt the dissenting view that 'intended use' includes unintended uses of a product if they were reasonably foreseeable by the defendant." *Jennings*, 181 F.3d at 1256 (quoting *High*, 610 So. 2d at 1263).

bitterant, failed to effectively disperse that bitterant in a way which an ordinary consumer would expect. In response, appellees argue the trial court correctly rejected the design defect theory on the grounds that a product is not necessarily defective simply because it can become dangerous if used irresponsibly or illegally.

While the elements of strict liability and negligence are similar, strict liability focuses on the reasonable expectations of *the consumer*. *See Ferayorni*, 711 So. 2d at 1170; *Faddish*, 881 F. Supp. 2d at 1370. "[U]nder the consumer-expectation theory[,] a product is defectively designed if the plaintiff is able to demonstrate that the product did not perform as safely as an ordinary consumer would expect when used in the intended or reasonably foreseeable manner." *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 504 (Fla. 2015) (quoting *McConnell v. Union Carbide Corp.*, 937 So. 2d 148, 151 (Fla. 4th DCA 2006)). However, in this case Merrill—not appellant—was the consumer, and appellant was not injured as a bystander while the product was being used as intended. Furthermore, given Merrill's intention to inhale the product for its unintended side-effects, and the product's explicit warnings against doing so, no inference can be made that she had any ordinary expectation whatsoever of the product performing safely in its customary use. Nonetheless, "[a] manufacturer is not under a duty in strict liability to design a product which is totally incapable of injuring those who foreseeably come in contact with the product." *Husky*, 434 So. 2d at 991 (quoting *Hunt v. Blasius*, 384 N.E.2d 368, 372 (Ill. 1978)).

Here, appellant alleges that Ultra Duster was not properly designed because the bitterant either did not properly mix with the DFE for adequate disbursal or did not effectively deter Merrill's intentional misuse. Neither theory meets the standard for a claim premised in strict liability. *See Brown*, 647 So. 2d at 1035. Appellant does not suggest a different bittering agent should have been used or that a change to the amount added would have prevented Merrill's improper use. Appellant only claims that the bitterant did not discourage Merrill from continued use, whether from inadequate dispersal or some other reason. Appellant argues that because Merrill continued to misuse the product, despite the foul-tasting additive, a manufacturing defect must have existed, even though the canister which Merrill used was never tested.

But the fact that Merrill continued misusing the product, whether because the bitterant had the potential for uneven disbursement or because of her addiction, does not plausibly suggest that the Ultra Duster canister which she purchased was not manufactured properly. As the warning label clearly states, Ultra Duster employs a bittering agent to

7

*discourage* ingesting the product, not to guarantee deterrence or prevent misuse from occurring. Although the alleged failure of the bitterant to disperse throughout the entire canister of Ultra Duster could potentially lead to more inhalation misuse of the product, inhalation is not the product's intended use. *High,* 610 So. 2d at 1262. The danger of improperly consuming the product, either with the bitterant or (as in this case) despite its presence, was made clear by the warning on the label and was expressly known to Merrill. *See Husky,* 434 So. 2d at 991.

Also significant is Merrill's admission to using many different products similar to Ultra Duster and purchasing them from various locations. While all of the products contained bittering agents to discourage consumption, Merrill testified that she eventually became so accustomed to the "nasty taste" found in all of the products to the point where she felt the taste was no longer noticeable. While any possible disproportionate disbursal of bitterant might have made Ultra Duster easier for all but the most undeterrable addicts to misuse, that possibility does not create an issue of fact regarding whether the product as manufactured was unsafe for its ordinary and intended use. *See Aubin,* 177 So. 3d at 504; *Husky,* 434 So. 2d at 991. Although a product must perform as safely as expected by the general consumer populace, this did not obligate appellees to make the product the safest possible or to make it physically impossible to ingest. *See id.*; *Grunow v. Valor Corp. of Fla.,* 904 So. 2d 551, 556 (Fla. 4th DCA 2005) (finding any product can be misused and cause injury and to create liability in that scenario inappropriately makes a manufacturer or distributor an insurer of the product); *Hernandez,* 903 F. Supp. 2d at 1360 (quoting *Husky,* 434 So. 2d at 991)).

Therefore, consistent with cases from the Florida Supreme Court and other District Courts of Appeal, we too hold that appellees are not strictly liable when a third party's injury results from a consumer's unintended and illegal use of a product. *See High,* 610 So. 2d at 1262. As such, summary judgment in favor of appellees on this claim was properly granted. *See Volusia County,* 760 So. 2d at 130. Therefore, we affirm on this issue.

**COUNT II – STRICT LIABILITY FOR FAILURE TO WARN**

For claims premised on a failure to warn, Florida courts have recognized that "[a] warning should contain some wording directed to the significant dangers arising from failure to use the product in the prescribed manner, such as the risk of serious injury or death." *Scheman-Gonzalez v. Saber Mfg. Co.,* 816 So. 2d 1133, 1139 (Fla. 4th DCA 2002) (quoting *Brito v. County of Palm Beach,* 753 So. 2d 109, 112 (Fla. 4th DCA

1998)). As we said in *Scheman-Gonzalez*, the *Restatement (Third) of Torts: Products Liability* (1998), is instructive on this point. Under the *Restatement* as incorporated into Florida law, a product is considered defective "when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings" and their omission "renders the product not reasonably safe." *Id.* at § 2(c); *see also Warren ex rel. Brassell v. K-Mart Corp.*, 765 So. 2d 235, 237–38 (Fla. 1st DCA 2000).

"Unless the danger is obvious or known, a manufacturer has a duty to warn where its product is inherently dangerous or has dangerous propensities." *Scheman-Gonzalez*, 816 So. 2d at 1139. "However, there is no duty to warn of an obvious danger." *Cohen v. Gen. Motors Corp., Cadillac Div.*, 427 So. 2d 389, 391 (Fla. 4th DCA 1983); *Insua v. JD/BBJ, LLC*, 913 So. 2d 1262, 1264 (Fla. 4th DCA 2005) (finding an inherent need for a warning on a dangerous product where an issue exists regarding whether the injured consumer "was aware of the danger involved and the danger was not obvious"). The presumption that an adequate warning would be heeded does not apply in a case where the product's user is already fully aware of the danger. *Id.*

Additionally, "a manufacturer has a duty to warn of dangerous contents in its product which could damage or injure even when the product is not used for its intended purpose." *High*, 610 So. 2d at 1262. "To warn adequately, the product label must make apparent the potential harmful consequences. The warning should be of such intensity as to cause a reasonable man to exercise for his own safety caution commensurate with the potential danger." *Am. Cyanamid Co. v. Roy*, 466 So. 2d 1079, 1082 (Fla. 4th DCA 1984); *see also Scheman-Gonzalez*, 816 So. 2d at 1139–40. "A warning should contain some wording directed to the significant dangers arising from failure to use the product in the prescribed manner, such as the risk of serious injury or death." *Brito*, 753 So. 2d at 112. The sufficiency and reasonableness of a manufacturer's warning, considering whether an injured person knew of the danger, are generally questions of fact left to the jury; however, *that is not the case where the "warnings are 'accurate, clear, and unambiguous.'" Id.* (emphasis added) (quoting *Felix v. Hoffmann-LaRoche, Inc.*, 540 So. 2d 102, 104 (Fla. 1989)); *see also Salozzo v. Wagner Spray Tech. Corp.*, 578 So. 2d 393, 394 (Fla. 3d DCA 1991); *Marchant v. Dayton Tire & Rubber Co.*, 836 F.2d 695, 701 (1st Cir. 1988); *see generally Vega v. City of Pompano Beach*, 551 So. 2d 594 (Fla. 4th DCA 1989).

Such warning labels are necessary to advise only those consumers who might be unaware of the danger involved. *See Cohen*, 427 So. 2d at 391

9

("[T]here is no duty to warn the [consumer] of a danger that he is aware of," nor is there a duty to warn of an obvious danger). The first part of the warning label on the Ultra Duster canister purchased by Merrill reads in pertinent part as follows:

> **MISUSE BY DELIBERATELY CONCENTRATING AND INHALING CONTENTS MAY BE HARMFUL OR FATAL. PLEASE USE THIS PRODUCT RESPONSIBLY.**
>
> **Contains a bitterant to help discourage inhalant abuse.**
>
> **Caution**
>
> **KEEP OUT OF REACH OF CHILDREN. MISUSE BY DELIBERATELY CONCENTRATING AND INHALING CONTENTS MAY BE HARMFUL OR FATAL. Use in well ventilated area. . . .**

This label expressly warned unaware consumers of the dangers associated with the intentional misuse of the product, specifically inhalation, due to the risk of harm and fatality, and it provided explicit notice of the significant dangers to consumers' health. *See Brito*, 753 So. 2d at 112. The consumer in this case—Merrill—was a regular purchaser and improper user of Ultra Duster, who admitted she not only knew of the warning label and the risks involved in inhaling DFE but also admitted she was so addicted that the warnings had no effect and she did not care about any possible harm.

Perhaps in the past Merrill may have been unaware that inhaling Ultra Duster could cause adverse health effects such as altered or loss of consciousness, euphoria, or dizziness. But she admittedly knew about the warning before this incident and disregarded the warning with full knowledge of the possible consequences. That being the case, appellees had no duty to further warn Merrill or to specifically warn that altering her mental state while driving might lead to an accident and thereby cause injury to third parties. *See Insua*, 913 So. 2d at 1264. Such consequences of intentionally driving under the influence of a mind-altering chemical— whether it be alcohol, DFE, or something else—are well known and obvious. In fact, Merrill certainly knew about such consequences and admitted to knowingly driving while under the influence of DFE in the past.

By her own admission, Merrill's addiction led her to simply ignore Ultra Duster's warning about the deleterious effects of inhaling, including the warning about its potential for causing death. This belies appellant's

argument that a different warning (for instance, that if she became unconscious while driving that she might injure someone else) would have caused Merrill to heed such caution and be more concerned about others than about herself. While Ultra Duster's warning label did not prevent Merrill from misusing the product, it was nonetheless sufficient to warn a reasonable person not to consume it. *See Scheman-Gonzalez*, 816 So. 2d at 1139; *Brown*, 647 So. 2d at 1035. Therefore, the sufficiency of this product's warning is not an issue of material fact in this case. *See Moore v. Morris*, 475 So. 2d 666, 668 (Fla. 1985) (finding summary judgment should be granted where "the facts are so crystallized that nothing remains but questions of law"). Therefore, we affirm the court's summary judgment on this issue as well.

## COUNT III – NEGLIGENCE

Appellant argues the trial court erred in granting summary judgment on his negligence claim based on the First District's *DZE* decision and in finding that Merrill's conduct was the sole superseding proximate cause of the accident and his resulting injuries. In response, appellees assert the trial court correctly relied on *DZE* to grant the motion for summary judgment on the negligence claims because Merrill was the sole proximate cause of the accident.

To prevail on a products liability claim based on negligence, a plaintiff must establish: (1) a duty or obligation recognized by the law requiring the defendant to protect others from unreasonable risks; (2) a breach of that duty; (3) a reasonably close casual connection between the conduct and the resulting injury; and (4) actual loss or damages. *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007).

"Of the four elements of a negligence claim, breach, causation, and damages are generally questions to be decided by the trier of fact. However, the determination of whether a duty is owed presents a question of law to be determined by the court." *Jackson Hewitt, Inc. v. Kaman*, 100 So. 3d 19, 28 (Fla. 2d DCA 2011). "The duty element of negligence is a threshold legal question; if no legal duty exists, then no action for negligence may lie." *Jenkins v. W.L. Roberts, Inc.*, 851 So. 2d 781, 783–84 (Fla. 1st DCA 2003) (affirming summary judgment granted in favor of a store because "there is no legal duty requiring a store to ensure that a product lawfully sold will ultimately be used by a customer or unknown third party for a lawful purpose").

Only when foreseeability is a "close case" does a question of fact arise. When the issue of foreseeability is clear, the courts should decide the issue

as a matter of law. *Demelus v. King Motor Co. of Fort Lauderdale*, 24 So. 3d 759, 761 (Fla. 4th DCA 2009) ("Foreseeability as it relates to duty in negligence cases is a question of law."). Two components of negligence employ a foreseeability analysis: duty and proximate cause. The foreseeability component of duty requires a general analysis of the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence. The foreseeability component of proximate cause requires an evaluation of the facts of the actual occurrence. This is why proximate cause is normally a factual question for the jury while duty is usually a legal question for the court.

To determine whether the risk of injury to a plaintiff is foreseeable under the concept of duty, courts must look at whether it was objectively reasonable to expect the specific danger causing the plaintiff's injury, not simply whether it was within the realm of any conceivable possibility. "As to duty, the proper inquiry for the reviewing appellate court is whether the defendant's conduct created a foreseeable zone of risk, not whether the defendant could foresee the specific injury that actually occurred." *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 504 (Fla. 1992) (emphasis omitted). As we have explained in the context of a products liability action:

> [F]oreseeability, alone, does not define duty—it merely determines the scope of the duty once it is determined to exist. The injured party must show that a defendant owed not merely a general duty to society but a specific duty to him or her, for without a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm.

*Grunow*, 904 So. 2d at 556 (quoting *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055 (N.Y. Ct. App. 2001)); *K.M. ex rel. D.M. v. Publix Super Mkts., Inc.*, 895 So. 2d 1114, 1117 (Fla. 4th DCA 2005) ("The existence of a special relationship gives rise to a duty to control the conduct of third persons so as to prevent them from harming others.").

"The duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader 'zone of risk' that poses a general threat of harm to others." *Granicz v. Chirillo*, 147 So. 3d 544, 547–48 (Fla. 2d DCA 2014) (quoting *McCain*, 593 So. 2d at 502)). "This concept is not to be confused with the proximate cause element of negligence which focuses on 'whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred.'" *Id.* "The court in proximate cause cases must determine, *inter alia*, (1) causation in fact, *i.e.*, whether the defendant's conduct was a

12

substantial factor in producing the result, and (2) whether the defendant's responsibility is superseded by an abnormal intervening force." *Hoffman v. Bennett*, 477 So. 2d 43, 44 (Fla. 3d DCA 1985).

Therefore, proximate cause is not always a jury question. Courts may resolve this issue as a matter of law in certain cases such as those involving intervening negligence: "Florida law does not permit a jury to consider proximate cause where a person responsible for the injury is voluntarily impaired or intentionally misuses a product." *See DZE*, 299 So. 3d at 541.

> Under the doctrine of intervening negligence, the original negligence is not regarded as the "proximate cause" of the injury, even though the injury might not have occurred but for the original negligence, if an independent efficient cause intervenes between the negligence and the injury and the original negligence does not directly contribute to the force or effectiveness of the intervening cause.

*St. Fort ex rel. St. Fort v. Post, Buckley, Schuh & Jernigan*, 902 So. 2d 244, 249 (Fla. 4th DCA 2005) (citing *Tampa Elec. Co. v. Jones*, 138 Fla. 746, 190 So. 26, 27 (1939)). "It is only when an intervening cause is completely independent of, and not in any way set in motion by, the tortfeasor's negligence that the intervening cause relieves a tortfeasor from liability." *Deese v. McKinnonville Hunting Club, Inc.*, 874 So. 2d 1282, 1287–88 (Fla. 1st DCA 2004).

In *DZE*, a man brought a wrongful death action on behalf of his deceased family members' estates against a manufacturer of certain products that included a chemical marketed as "potpourri" containing a synthetic marijuana labeled as "spice." *DZE*, 299 So. 3d at 539. A driver who had voluntarily consumed the potpourri became impaired, drove at high rate of speed, and rammed his vehicle into another vehicle, causing the deaths of the other vehicle's passengers. *Id.* The plaintiff alleged numerous bases for liability yet went to trial on only two of the claims— negligence and strict liability—both of which were premised on a "failure to warn" theory. *Id.* The First District held the driver's criminal conduct— not the manufacturer's actions—was the sole proximate cause of those deaths as a matter of law. *Id.* at 540; *see McCain*, 593 So. 2d at 504 (stating the question of proximate cause is generally left to the fact-finder, but the judge may address this matter where the facts are unequivocal, such as where the evidence supports no more than a single inference). As such, the manufacturer owed no duty to the plaintiff to prevent the

accident. *See DZE*, 299 So. 3d at 540 n.2 (citing *Aguila v. Hilton, Inc.*, 878 So. 2d 392 (Fla. 1st DCA 2004)).

The *DZE* court relied in part on the Florida Supreme Court's decision in *Department of Transportation v. Anglin*, 502 So. 2d 896, 898 (Fla. 1987), a case involving a suit against the Department for a negligent road design that caused the plaintiff's car to stall. *Id.* at 897. There, the plaintiff suffered catastrophic injuries when an intervening actor slammed into plaintiff's stalled car. *Id.* The court upheld the trial court's summary judgment in the Department's favor on the issue of proximate cause, holding that even where an actor's conduct creates a dangerous situation, the law will not allow a jury to find proximate cause where an unforeseeable, intervening act is responsible for the injuries:

> While it may be arguable that petitioners, by creating a dangerous situation which caused the respondents to require assistance, could have reasonably foreseen that someone may attempt to provide such assistance, it was not reasonably foreseeable that [an intervening actor] would act in such a bizarre and reckless manner. Petitioners' negligent conduct did not set in motion a chain of events resulting in injuries to respondents; it simply provided the occasion for [the intervening actor's] gross negligence.

*Id.* at 899–900 (citing *Mull v. Ford Motor Co.*, 368 F.2d 713 (2d Cir. 1966)).

The First District held that any conclusion that the manufacturer's failure to warn had been the proximate legal cause of the devastating crash required speculation that the manufacturer could have foreseen that the driver would: "1) disregard the warning on the product and consume the potpourri; 2) become voluntarily intoxicated; and 3) drive recklessly in violation of the state's criminal laws and cause an accident." *DZE*, 299 So. 3d at 541. The manufacturer correctly argued that liability could not be imposed for injuries to a third party who was not *directly* impacted by the manufacturer's product, especially where another party voluntarily consumed the product to become intoxicated and made the illegal decision to drive. *Id.* As a matter of law, the driver's conduct—not the manufacturer's—was the accident's sole superseding proximate cause, and the trial court in that case erred in allowing a jury to decide otherwise. *Id.*

The *DZE* court also looked to similar cases outside of Florida that refused to recognize proximate causation where voluntary impairment resulted in injuries to third parties. The facts of one such case, *Horstman*

*v. Farris*, 725 N.E.2d 698 (Ohio Ct. App. 1999), closely mirrors what occurred here. In *Horstman*, the plaintiffs appealed a summary judgment arising from an automobile accident that occurred when the minor driver of another car inhaled a harmful intoxicant and drove head-on into the car operated and occupied by the Horstman family. *Id.* at 517. The plaintiffs further argued the manufacturer knew its product was being abused but failed to remedy the problem in a timely manner despite readily available methods of preventing misuse. *Id.* at 517–18. The plaintiffs contended that a genuine issue of material fact existed about whether the intoxicant was a defective product and whether the defect was the proximate cause of their injuries. *Id.*

The *Horstman* court found as a matter of law that even if the manufacturer's product was defective in design, that defect was not the proximate cause of plaintiff's injuries. *Id.* at 518. The driver's conduct was the proximate cause. *Id.* The court also found that the retailer was not negligent in selling the propellant to the minor driver without inquiring about his intended use for it. *Id.* at 523–24. The driver's intentional inhalation of the propellant to become intoxicated broke the chain of causation, making the driver the sole proximate cause of plaintiffs' injuries:

> In the case before us, the record shows that [the driver] knowingly, intentionally, and willfully misused the product in an illegal manner that he knew was dangerous. He not only abused the product but he did so while driving a vehicle, despite his knowledge that the product caused intoxication. He also proceeded to drive that vehicle while intoxicated from huffing, although he testified that he knew that he was not capable of driving at that time. [The manufacturer] did not prompt the criminal act. Thus, [the driver]'s purposeful misuse of the product, in a manner for which it was clearly not intended, is enough to break the chain of causation between the alleged defect and the injuries to the Horstmans.

*Id.* at 521. As a result, the plaintiffs' injuries were not the foreseeable result of any alleged defect—as injuries to third parties caused by a motor vehicle's defective brakes or faulty accelerator would be—but were instead caused by the driver's willful, reckless, and unlawful conduct. *Id.*

These cases demonstrate that a duty of reasonable care is not owed to the world at large but arises out of a relationship between the parties. *See McCain*, 593 So. 2d at 504; *Grunow*, 904 So. 2d at 556. In Florida, there is no duty to prevent—and no liability for—a third party's misconduct

15

absent the existence of a special relationship. *See Trianon Park Condo. Ass'n, Inc. v. City of Hialeah*, 468 So. 2d 912, 918 (Fla. 1985).

Therefore, to succeed on his negligence claim, appellant must also show that appellees owed a specific duty to him. None exists here between appellant and appellees, nor did such a relationship exist between appellees and Merrill to support the imposition of any such duty:

> Under the common law, a person has no duty to control the tortious or criminal conduct of another or to warn those placed in danger by such conduct unless there is a special relationship between the defendant and the person whose behavior needs to be controlled or the person who is a foreseeable victim of such conduct.

*Palmer v. Shearson Lehman Hutton, Inc.*, 622 So. 2d 1085, 1089 (Fla. 1st DCA 1993) (citing *Boynton v. Burglass*, 590 So. 2d 446 (Fla. 3d DCA 1991)). "Implicit in the special relationship exception . . . is the proposition that such special relationship must include the right *or the ability* to control another's conduct." *Garrison Ret. Home Corp. v. Hancock*, 484 So. 2d 1257, 1261 (Fla. 4th DCA 1985) (emphasis in original) (quoting *Hasenei v. United States*, 541 F. Supp. 999, 1009 (D. Md. 1982)).

Although negligence outside the context of products liability is broader and encompasses a foreseeable zone of risk, appellees' duty of foreseeability for the usage of Ultra Duster is narrowed. Because no one disputed that Merrill was voluntarily impaired by her misuse of the product, and without a special relationship between appellees and Merrill, the trial court was able to properly determine no causal link existed as a matter of law between appellees' actions that caused the accident and appellant's injury. *See DZE*, 299 So. 3d at 541; *Barnes v. B.K. Credit Serv., Inc.*, 461 So. 2d 217, 219 (Fla. 1st DCA 1984); *Labzda v. Purdue Pharma, L.P.*, 292 F. Supp. 2d 1346, 1356 (S.D. Fla. 2003). The causal link between the danger (being struck by a vehicle driving off the roadway) and the alleged misconduct (manufacturing and selling a household dust-removal product containing DFE) is simply too attenuated and remote to support the existence of any duty to third parties arising from the product's misuse. The foreseeability of Merrill's huffing Ultra Duster while driving is not a close case that would raise a question of fact for a jury to determine.

Without the existence of a special relationship with Merrill, appellees had no ability to supervise or control her behavior and no involvement in her decision to become impaired while driving. No contractual relationship

16

existed between appellant, appellees, and Merrill. The accident did not involve either an employee or vehicle owned or operated by appellees, nor did it occur on their property. Nor did the canister used by Merrill malfunction to directly cause appellant's injury.

Although we can foresee that a person who is distracted or impaired while driving might cause an accident, we do not agree with the leap in logic which appellant asks us to make—that it is likewise foreseeable to any legally significant extent that the manufacture and ultimate sale of Ultra Duster would result in a car crash. Stated differently, the subject product did not cause this accident; rather, Merrill's impaired faculties resulting from the product's inappropriate use caused the accident. Taken to its logical extension, appellant's theory of liability against appellees could allow almost limitless legal responsibility relating to any ordinary consumer product which a driver could conceivably and improperly use to cause injury or damage. *See, e.g., Grunow*, 904 So. 2d at 556–57 ("Virtually any product is capable of producing injury when put to certain uses or misuses," and "[t]o hold otherwise would make a manufacturer or distributor an insurer of its product."); *Bruner v. Anheuser-Busch, Inc.*, 153 F. Supp. 2d 1358, 1361 (S.D. Fla. 2001) ("[V]oluntary drinking of alcohol is the proximate cause of an injury, rather than the manufacture or sale of those intoxicating beverages to that person."); *Williams v. Cingular Wireless*, 809 N.E.2d 473, 479 (Ind. Ct. App. 2004) ("Although it is foreseeable that cellular phone use while driving may contribute to a car accident, it is not foreseeable that the sale of a phone to a customer will necessarily result in a car accident."); *Allen v. Walmart Stores, L.L.C.*, 907 F.3d 170, 176–77 (5th Cir. 2018) (finding no liability as a matter of law arising from a retail store's sale of sixty cans of dust remover in a twenty-seven-hour period to a purchaser who inhaled the contents and died in the store's parking lot). As the *Williams* court observed:

> [M]any items may be used by a person while driving, thus making the person less attentive to driving. It is foreseeable to some extent that there will be drivers who eat, apply make up, or look at a map while driving and that some of those drivers will be involved in car accidents because of the resulting distraction. However, it would be unreasonable to find it sound public policy to impose a duty on the restaurant or cosmetic manufacturer or map designer to prevent such accidents. It is the driver's responsibility to drive with due care . . . . To place a duty on [a company] to stop selling [a product] because [it] might be involved in a car accident would be akin to making a car manufacturer stop selling otherwise

17

> safe cars because the car might be negligently used in such a
> way that it causes an accident.

*Williams*, 809 N.E. 2d at 478.

In sum, appellant's injuries were the unfortunate result of Merrill's reckless indifference to her own safety as well as the safety of others. His injuries were not the result of appellees' conduct. Because Merrill's actions were separate from those of the appellees and were neither controlled, encouraged, nor caused by them, Merrill's misuse of the Ultra Duster canister was the sole proximate legal cause of both the accident and appellant's resulting injuries. *See Deese*, 874 So. 2d at 1287–88. Even though the risk of a driver simultaneously abusing a dust-removal product and consequently striking either a vehicle or person off a roadway is within the boundless realm of conceivable possibilities, it was not objectively reasonable for Merrill's criminal conduct to be foreseeable as a matter of law to establish either duty or proximate cause in the context of this product liability action. *Cf. Vining v. Avis Rent-a-Car Sys., Inc.*, 354 So. 2d 54, 55–56 (Fla. 1977) (finding "a reasonable man should foresee the theft of an automobile left unattended with the keys in the ignition in a high crime area"); *but cf. Shurben v. Dollar Rent-A-Car*, 676 So. 2d 467, 468 (Fla. 3d DCA 1996) (finding a Miami car rental company had a duty to warn its foreign customers of foreseeable criminal conduct because it had knowledge of the high level of crime in Miami and a reasonable rental company in possession of those facts would understand that its customers would be exposed to unreasonable risk of harm if not warned). That specific danger was not "clear to the person of ordinary prudence," because Merrill's unlawful actions constituted an intervening force which replaced any alleged negligence on appellees' part. *See St. Fort*, 902 So. 2d at 249.

We therefore agree with the trial court's application of *DZE* and affirm the summary judgment granted in favor of appellees on appellant's negligence claim.

*Affirmed.*

LEVINE and FORST, JJ., concur.

\*　　　\*　　　\*

***Not final until disposition of timely filed motion for rehearing.***

18